IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

BARBARA BAGWELL, et al.,      :
                              :
     Plaintiffs,         :
                              :
v.                       :     Civil Action File No.:
                              :     2:08-CV-191-RWS-SSC
PEACHTREE DOORS AND      :
WINDOWS, INC., THE         :
PEACHTREE COMPANIES, INC.  :
(WISCONSIN), THE PEACHTREE :
COMPANIES, INC., SNE       :
ENTERPRISES, INC., WEATHER :
SHIELD MFG., INC. and WEATHER :
SHIELD, INC.,           :
                              :
     Defendants.        :

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

This case is before the court on cross motions for summary judgment and other motions, including the following: Defendants' Motion for Summary Judgment [Doc. 244]; Plaintiffs' Motion to Extend Time to File Exhibits by One (1) Day [Doc. 246][1]; Plaintiffs' Motion to Exceed Page Limitations of N.D.Ga. Local Rule 7.1(D) [Doc. 247][2]; Plaintiffs' Motion for Summary Judgment [Doc. 248]; Defendants' Motion for Leave to Exceed Page Limitation for Defendants' Brief in

---

[1] Plaintiffs' Motion to Extend Time to File Exhibits by One (1) Day [Doc. 246] is **GRANTED**.

[2] Plaintiffs' Motion to Exceed Page Limitations of N.D.Ga. Local Rule 7.1(D) [Doc. 247] is **GRANTED**.

Opposition to Plaintiffs' Motion for Summary Judgment [Doc. 254][3]; Plaintiffs' Motion to Exceed Page Limitations of N.D.Ga. Local Rule 7.1(D) [Doc. 273][4]; Plaintiffs' Notice of Objection and Motion to Strike Evidence Under Federal Rule of Evidence 103(a) [Doc. 275]; and Plaintiffs' Request for Oral Argument [Doc. 276].

## I.  <u>Procedural History</u>

On September 12, 2008, thirty-two (32) Plaintiffs filed this complaint [Doc. 1] against Defendants.  Plaintiffs were formerly employed at the Peachtree Doors and Windows, Inc. facility in Gainesville, Georgia until they were terminated in April and May 2007 during a reduction in force resulting from the "transferred production" of the " '300 series' casement and double hung windows" from the Gainesville facility to Mosinee, Wisconsin.  (<u>See</u> Doc. 1, Compl. ¶¶ 18-22). Plaintiffs allege that: Defendants discriminated against Plaintiffs on the basis of their race when they treated Hispanic employees more favorably in the terms and conditions of their employment and when they terminated Plaintiffs "rather than less qualified Hispanic employees," in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, <em>et. seq.</em> ("Title VII") and 42 U.S.C. § 1981 ("1981") (Count I); Defendants discriminated against Plaintiffs on the basis of their national origin when they treated Hispanic employees more favorably in the terms

---

[3] Defendants' Motion for Leave to Exceed Page Limitation for Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment [Doc. 254] is **GRANTED**.

[4] Plaintiffs' Motion to Exceed Page Limitations of N.D.Ga. Local Rule 7.1(D) [Doc. 273] is **GRANTED**.

and conditions of their employment and when they terminated Plaintiffs "rather than less qualified Hispanic employees," in violation of Title VII (Count II); and Defendants violated the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 ("WARN Act") "by ordering a plant closing or mass layoff without providing sixty (60) days notice to Plaintiffs and prior to the expiration of 60 days following such order" (Count III).

On December 18, 2008, Plaintiffs filed an amended complaint [Doc. 5] asserting the same claims as those in their original complaint.  Defendants filed their answer on January 26, 2009 [Doc. 16], and discovery proceeded.

Defendants have now filed a motion for summary judgment, including a memorandum of law, a statement of undisputed material facts[5] and exhibits in support of their motion.   [Doc. 244].   In response, Plaintiffs have filed a memorandum and exhibits [Doc. 257], a statement of additional disputed material facts [Doc. 256][6] and a response to Defendants' statement of material facts with exhibits [Doc. 258].  Defendants filed a reply to Plaintiffs' response, including a memorandum, a "Reply to its [sic] Proposed Findings of Fact (Statement of Material Facts) in Support of Their Motion for Summary Judgment," a response

---

[5] Local Rule 56.1B.(1), NDGa. requires the movant to file a "statement of material facts to which the movant contends there is no genuine issue to be tried." Although Defendants titled their statement of facts "Defendants' Proposed Findings of Fact in Support of Their Motion for Summary Judgment" [Doc. 244-2],  Defendants acknowledge "that their Proposed Findings of Fact were mislabeled, and should have been titled Defendants' Statement of Material Facts." (Doc. 253, Def. Resp. at 1 n.1).

[6] This document appears to be identical to a document incorrectly docketed as "Response to Statement of Material Facts re 244 Motion for Summary Judgment" filed by Plaintiffs [Doc. 255]. Plaintiffs' response to Defendants' statement of material facts is docket entry 258.

to Plaintiffs' statement of material facts, and exhibits, including declarations that had not been previously submitted, as discussed *infra*. [Doc. 272].

Plaintiffs have also filed a motion for summary judgment, including memorandum and statement of undisputed material facts [Doc. 248] and supporting exhibits [Doc. 249]. Defendants filed a response to Plaintiffs' motion, including a memorandum, a response to Plaintiffs' statement of facts, a statement of additional undisputed material facts, and exhibits. [Doc. 253]. Plaintiffs filed a reply, including a memorandum and a response to Defendants' statement of material facts. [Doc. 274].

The parties have also filed the transcripts of forty-eight (48) depositions as part of the record.

Plaintiffs also filed a Notice of Objection and Motion to Strike Evidence Under Federal Rule of Evidence 103(a) [Doc. 275], and a Request for Oral Argument [Doc. 276]. Defendants filed a response to Plaintiffs' objection and motion to strike [Doc. 279] and a response in opposition to Plaintiffs' request for oral argument [Doc. 277]. Plaintiffs filed a reply in support of their objection and motion to strike. [Doc. 283].

## II.  **Plaintiffs' Request for Oral Argument [Doc. 276]**

Plaintiffs request oral argument on their "Notice of Objection and Motion to Strike Evidence Under Federal Rule of Evidence 103(A) and the pending motions for summary judgment." (Doc. 276 at 1). Plaintiffs assert that "given the number of briefs and exhibits filed with the summary judgment motions, responses and

replies, to the extent oral argument would be beneficial to the Court, Plaintiffs hereby request oral argument." (Id.).

Defendants "respectfully ask that the Court deny Plaintiffs' request for oral arguments." (Doc. 277, Def. Br. at 1).  They note the extensive briefing that has occurred in this case and the cost that would be incurred if the court grants Plaintiffs' request.  (Id.).

Local Rule 7.1E., NDGa. provides that "Motions will be decided by the court without oral hearing, unless a hearing is ordered by the court."  The undersigned is confident that the court will be able to determine from the submissions of the parties, and the court's own review of the record, what evidence may be considered in deciding the pending motions and whether genuine issues of fact exist that preclude the entry of summary judgment.  Therefore, oral argument is not necessary and Plaintiffs' request for oral argument [Doc. 276] is **DENIED**.  See Hill v. Bank of Am., N.A., No. 1:06-cv-00804-GET, 2007 U.S. Dist. LEXIS 39925, at *3 (N.D. Ga. June 1, 2007).

### III.   Plaintiffs' Objection/Motion to Strike [Doc. 275]

Pursuant to Fed. R. Evid. 103(a), Plaintiffs object to and move to strike the declarations of Thomas Ricky Walden, Evey Earl Doan, Sung Le, Terry Adams and Michael Jarrard, which are attached to Defendants' reply in support of their motion for summary judgment (see Decls. attached to Doc. 272).  (Doc. 275 at 1-

11)[7]; they also object to and move to strike Defendants' reply to Plaintiffs' response to Defendants' statement of material facts [Doc. 272-1] and Defendants' response to Plaintiffs' statement of additional material facts [Doc. 272-2] on the ground that those filings violate LR 56.1, NDGa.  (Doc. 275 at 1, 11-12).

**A.**     **The Declarations of Walden, Doan, Le, Adams and Jarrard**

  **1.**     **Technical Defects**

Plaintiffs object to the declarations because they are not signed and because they do not comply with 28 U.S.C. § 1746, which requires that the declarations be made under penalty of perjury.  (Doc. 275 at 2-4).

In response to Plaintiffs' objection and motion to strike, Defendants filed the declarations of Walden, Doan, Le, Adams and Jarrard with their signatures and with language added that the declarations are "made under penalty of perjury." (See Def. Ex. 1 to Doc. 279 (Doc. 279-1)).  The undersigned finds that Defendants have cured the defects asserted by Plaintiffs.  Therefore, to the extent that Plaintiffs' objection and motion to strike the declarations is based on these defects, the objection is overruled, and the motion to strike is denied.

  **2.**     **Substantive Objections**

Plaintiffs object to the declarations and move to strike them because they are attached to Defendants' reply brief [Doc. 272] and, according to Plaintiffs,

---

[7] The pages of Plaintiffs' objection/motion to strike [Doc. 275] are not numbered as required by LR 5.1E., NDGa.  The citations to Plaintiffs' motion are based on the pagination in the court's electronic filing system (CM/ECF).

"Defendants cannot show that the declarations reply to any new and unanticipated response in Plaintiffs' responsive brief" (Doc. 275 at 4), and because they are "sham affidavits" as they contradict prior deposition testimony given by the declarants (id. at 5-11).

Le, Adams, Walden and Jarrard are former supervisors who, as discussed *infra*, provided rankings of employees under their supervision prior to the layoffs at issue in this case; Doan is the former plant manager who directed the supervisors to rank their employees.  Le, Adams, Walden and Jarrard each testified in his declaration that, among other things, he created the rankings of employees attached to his declaration, and that "[t]hese rankings were ultimately relied upon by the supervisors and management of Peachtree Doors and Windows, Inc., in determining which employees would be laid off as part of the late April/early May 2007 layoffs that are the subject of this lawsuit."  (See Decls. attached to Doc. 272).   Doan testified in his declaration that, among other things, he "directed supervisors at the plant to prepare rankings of the employees under their supervision, which included the Plaintiffs," and "[t]hese rankings were ultimately relied upon by the supervisors and management, including myself, of Peachtree Doors and Windows, Inc., in determining which employees would be laid off as part of the late April/early May 2007 layoffs that are the subject of . . . this lawsuit."  (See Doan Decl., Def. Ex. A to Doc. 272 (Doc. 272-4), ¶ 4).

Pretermitting the issue of whether it is appropriate to submit such declarations for the first time with a reply brief, the undersigned notes that the

information provided in these declarations is largely set forth in other places in the record.  As discussed *infra*, there is evidence in the record, including Doan's deposition testimony, that prior to the layoffs, Doan directed supervisors to rank their employees, and that Doan considered these rankings in making the layoff decisions.  (See Doan Dep. at 25-27, 37-39, 102-04).   Furthermore, even if the declarations are considered, they do not demonstrate an **absence** of triable fact, for the reasons discussed below in the analysis of whether that there are triable issues of material fact with respect to Defendants' reasons for the layoff decisions.

As for Plaintiffs' argument that the declarations should be stricken as "sham" affidavits, the undersigned find that the declaration testimony is not directly contradictory to the declarants' deposition testimony.  While it is somewhat troubling that Walden, Le, Adams and Jarrard do not explain in their declarations how they know that the ranking sheets were relied on in making the layoff decisions, the undersigned has not relied on their assertions to that effect in considering Defendants' motion for summary judgment.  To the extent that there are inconsistencies or omissions in these declarations, those deficiencies simply go to the credibility of the witnesses, a matter to be determined by the fact finder at trial.  See, e.g., Tippens v. Celotex Corp., 805 F.2d 949, 954-55 (11th Cir. 1986) (finding that inconsistencies between deposition and affidavit simply created an issue of credibility to be determined by the trier of fact where the witness deposed that he could not recall specific instances of using a specific product while working with the plaintiff but stated in his affidavit that he worked with

8

plaintiff during periods where he was using Celotex's asbestos-containing products).

Accordingly, Plaintiffs' objections to the declarations of Walden, Doan, Le, Adams and Jarrard are overruled, and Plaintiffs' motion to strike these declarations is denied.

## B.  <u>Defendants' Reply to Plaintiffs' Response to Defendants' Statement of Material Facts</u>

With their reply to Plaintiffs' response to their motion for summary judgment, Defendants filed a response to Plaintiffs' statement of material facts, as required by LR 56.1B.(3), NDGa. [Doc. 272-2]; they also filed a reply to Plaintiffs' response to Defendants' statement of material facts [Doc. 272-1].  Plaintiffs argue that Defendants' reply to Plaintiffs' response to Defendants' statement of material facts [Doc. 272-1], "should be stricken because it is not permitted under Local Rule 56.1." (Doc. 275 at 11).  Defendants acknowledge that "the local rules do not specifically provide for  the filing of a reply," but assert that they "offered the reply in an effort to bring clarity to this case, the facts of which are straightforward." (Doc. 279 at 10).  Defendants also assert that they "did not raise new arguments or introduce facts which were not already in evidence," but "[r]ather, Defendants directly addressed the evidentiary objections which Plaintiffs raised and established for the Court that, despite Plaintiffs' efforts to convolute the facts, the facts of this case are undisputed."  (<u>Id.</u> at 10-11).

Regardless of whether the Local Rules allow a reply to a response to a

statement of material facts, the undersigned has not relied on Defendants' reply [Doc. 272-1] in determining what facts are material in this case and whether they are in dispute.  As discussed *infra*, the undersigned has reviewed the parties' voluminous, but largely unhelpful, statements of facts and responses, as well as other record evidence, in making these determinations.  Accordingly, Plaintiffs' objections to Defendants' reply are overruled, and their motion to strike Defendants' reply is denied as moot.

**C.   Defendants' Response to Plaintiffs' Statement of Additional Material Facts**

As required by LR 56.1B.(3), NDGa., Defendants filed a response to Plaintiffs' statement of additional material facts [Doc. 272-2].  Plaintiffs argue that Defendants' response "should be stricken as violating Local Rule 56.1" because Defendants "made arguments, which are neither correct nor proper under the Local Rule."  (Doc. 275 at 12).  Plaintiffs do not cite to any specific improper response in their motion, however.  Therefore, the undersigned finds that Plaintiffs have not demonstrated that Defendants' response should be stricken and Plaintiffs' motion to strike Defendants' response to Plaintiffs' statement of additional material facts is denied.  The undersigned will disregard any statements of material fact or responses thereto that do not comply with the requirements of LR 56.1B.(1)-(3), NDGa.

In summary, the objections in Plaintiffs' Notice of Objection and Motion to Strike Evidence under Federal Rule of Evidence 103(a) [Doc. 275] are

10

**OVERRULED** and the motion is **DENIED**.

## IV.  Facts

### A.    Standards for Determining Facts for Summary Judgment

The "facts" have been presented by the parties in the following filings:
Defendants' statement of undisputed material facts in support of their motion for
summary judgment [Doc. 244-2] (hereinafter referred to as "Def. SMF"); Plaintiffs'
response to that statement [Doc.  258]; Plaintiffs' statement of additional facts in
response to Defendants' motion for summary judgment [Doc. 256] (hereinafter
referred to as "Pl. SMF"); Defendants' response to that statement [Doc. 272-2];
Plaintiffs' statement of undisputed material facts in support of their motion for
summary judgment [Doc. 248-2] (hereinafter referred to as "Pl. SMF II");
Defendants' response to that statement [Doc. 253-1]; Defendants' statement of
additional facts in response to Plaintiffs' motion for summary judgment [Doc. 253-
2] (hereinafter referred to as "Def. SMF II"); and Plaintiffs' response to that
statement [Doc. 274].[8]  The court has reviewed the record, including the parties'
filings, to determine whether genuine issues of material fact exist to be tried.
However, the court is not obligated to "scour the record" to determine whether
triable issues of fact exist.  Tomasini v. Mt. Sinai Med. Ctr. of Fla., 315 F. Supp.
2d 1252, 1260 n.11 (S.D. Fla. 2004).  The facts are construed in the light most
favorable to the non-movant.  See Frederick v. Sprint/United Mgmt. Co., 246 F.3d

---

[8] The undersigned addresses Plaintiffs' objections and motion to strike some of these
materials *infra*.

1305, 1309 (11th Cir. 2001).

The undersigned finds it necessary before setting out the operative facts and analyzing the parties' arguments to point out that the parties' presentations of "the facts" has hindered more than it has assisted the court's task of determining whether any party is entitled to summary judgment.  This observation is intended to offer guidance to counsel so that their future court filings will reflect an understanding that the court's resources are not limitless and that effective presentation requires counsel to do the work of winnowing out the material facts and presenting them in accordance with the Local Rules, an approach that will ultimately benefit the parties because it will make it easier for the court to understand their respective positions.  A few examples will illustrate the point.

First, Defendants filed a 47-page statement of material facts [Doc. 244-2], to which Plaintiffs filed a 395-page response [Doc. 258].  In response to Defendants' 64-page statement of additional material facts [Doc. 253-2], Plaintiffs filed a 513-page response [Doc. 274-1].  Therefore, Defendants have filed over 100 pages of "material facts" and Plaintiffs have filed over 900 pages of responses. This volume alone is surprising, given that both Plaintiffs and Defendants contend there are no genuine issues of material fact to be tried.  Contributing to the volume, and more problematic, is that in many instances, Plaintiffs' responses span several pages and consist of boilerplate objections and arguments, thus transforming those responses into a series of "briefs" concerning the asserted

facts.[9]  These responses are not in compliance with LR 56.1 B.(2) and (3), NDGa.

which require that responses be "nonargumentative" and "concise," and they are

not helpful.

In addition, Defendants repeatedly cite to their "Fifth Supplemental Answer

to Plaintiffs' Interrog. No. 88" in support of their statements of material fact.  (See,

e.g., Doc. 244-2, Def. SMF, ¶¶ 1-6, 8, 11, 14, 16-17, 19-24; Doc. 253-2, Def. SMF

II, ¶¶ 1-6, 9, 12, 15, 17-18, 20-25).  Although Defendants do not cite to the exhibit

that includes that Answer, the undersigned notes that Defendants submitted

Plaintiffs' Interrogatory Number 88 and Defendants' fifth supplemental response

thereto in support of their motion for summary judgment (see Doc. 244-47) and

with their response to Plaintiffs' motion for summary judgment (see Doc. 253-27).

Plaintiffs' Interrogatory Number 88 requested information about the

decisionmakers for the layoffs at issue and the reasons for those decisions.  (Doc.

244-47).  Defendants' response to that interrogatory spans 17 pages.  (Id.).

Defendants' reliance on their own interrogatory response is inappropriate

for several reasons.  In the first place, Defendants have not shown that the

interrogatory was verified by a person with personal knowledge of the facts

---

[9] Plaintiffs also take inconsistent positions with respect to certain evidence.  For example, in several instances, Plaintiffs object to the admissibility of a particular exhibit cited to by Defendants, the report of Defendants' expert, on the ground that "Defendants' expert has no personal knowledge of the persons laid off in late April/early May 2007."  (See, e.g., Doc. 274-1, Pl. Resp. to Def. SMF II, ¶¶ 267, 268, 270-74, 276-88).  Yet that exhibit, Plaintiffs' Exhibit 38 (see Doc. 249-38), was submitted by **Plaintiffs** and was also cited to by **Plaintiffs** in their summary judgment filings.  (See, e.g., Doc. 248-2, Pl. SMF II, ¶¶ 21-55; Doc. 258, Pl. Resp. to Def. SMF, ¶ 7 at pp. 15-20).

asserted in the response to Plaintiffs' Interrogatory Number 88.  "[A]nswers to interrogatories are subject to the same requirements as an affidavit would be under _Rule 56(e)_, and must be made on personal knowledge, and contain facts which could be converted into an admissible form at trial." Casiano v. Gonzales, No. 3:04CV67/RV/MD, 2006 U.S. Dist. LEXIS 3593, at *26 (N.D. Fla. Jan. 31, 2006) (citing Starr v. Pearle Vision, 54 F.3d 1548 (10th Cir. 1995)).  Although Plaintiffs state that John Kuhn verified Defendants' Fifth Supplemental Answers to Interrogatories and quote the text of the verification (see Doc. 258, Pl. Resp. to Def. SMF at 2-4), that verification is not attached to either Doc. 244-47 or Doc. 253-27.  Moreover, even if Kuhn, Weather Shield Manufacturing's Director of Finance (Kuhn Dep. I at 5)[10] and Defendants' Fed. R. Civ. P. 30(b)(6) representative, did sign a verification, there is no evidence that he had personal knowledge of the facts asserted in the response, which relate to the purported reasons for transferring production of the windows at issue in this case, and the reasons for selecting Plaintiffs for layoff.[11]  See, e.g., Duff v. Lobdell-Emery Mfg. Co., 926 F. Supp. 799, 803 (N.D. In. 1996) (finding that defendant improperly relied on interrogatory responses given by its corporate representative to support its motion for summary judgment because the representative's "answers to the interrogatories are not admissible since they are not founded upon personal

---

[10] John Kuhn was deposed twice. The undersigned cites his July 9, 2009 deposition as "Kuhn Dep. I" and his March 23, 2010 deposition as "Kuhn. Dep. II."

[11] In fact, in Kuhn's first deposition, he testified that he had no knowledge of the financial justifications for the transfer.  (Kuhn Dep. I at 30).

knowledge and are (when offered by [the representative]) merely hearsay"). Finally, Defendants' general citation to their 17-page response, without specific page or paragraph references, violates the requirement of LR 56.1B.(1)(a), NDGa. that statements of material fact must be "supported by a citation to evidence (including page or paragraph number)."  The court will not scour Defendants' 17-page response to Interrogatory Number 88 to determine whether it supports Defendants' assertions.   Accordingly, the undersigned has not considered Defendants' response to Interrogatory Number 88 in determining the issues on summary judgment.

Thus, although the undersigned has considered the parties' statements of material facts and responses thereto, because of the deficiencies in their presentations, it has been necessary for the court to review the sizeable evidentiary record independently and without significant assistance from the parties in order to determine what the material facts are in this case and whether they are in dispute.  The facts, so determined and for purposes of deciding the parties' motions for summary judgment only, are set out below.  Where the facts are disputed, the dispute is noted.

## B.     __The Facts Relevant to the Parties' Motions for Summary Judgment__[12]

### 1.     __The Parties__

Defendants are a collection of companies referred to as the "Schield Family

---

[12] Certain other facts relevant to the undersigned's consideration of the parties' motions are discussed in the body of this Report.

Companies," whose primary purpose is to manufacture and sell windows and doors.  (See Pl. SMF II, ¶ 66; Def. Resp. to Pl. SMF II, ¶ 66; Kuhn Dep. II at 36). Edward Schield, Mark Schield, Kevin Schield, and a trust for Brian Schield ("the Schields") own all or almost all of the shares of The Peachtree Companies, Inc., Weather Shield Mfg., Inc. ("WSM"), and Weather Shield, Inc. ("WS").  (Pl. SMF II, ¶ 61).[13]  Peachtree Doors and Windows (sometimes referred to as "PDW") and SNE Enterprises, Inc. ("SNE") are wholly owned by The Peachtree Companies, Inc., of which the Schields have 100 percent ownership.  (Pl. SMF II, ¶ 62).  Excluding Brian Schield, who sits only on the board of directors of WSM, the Schields sit on the board of directors of every defendant company.  (Pl. SMF II, ¶ 63).  The Schields also hold executive positions across the companies: Edward Schield is the president of WSM, WS, SNE and PDW; Mark Schield is a vice-president of WSM, WS, the Peachtree Companies, SNE and PDW; and Kevin Schield is a vice-president of WSM, WS, SNE and PDW, as well as the president of the Peachtree Companies.  (Pl. SMF II, ¶ 64).  In 2007, the corporate headquarters for The Peachtree Companies was in Mosinee, Wisconsin, and the corporate headquarters for Weather Shield was in Medford, Wisconsin.  (Def. SMF II, ¶ 439).

---

[13] The parties have not explained the difference between "The Peachtree Companies, Inc." and "The Peachtree Companies, Inc. (Wisconsin)."  In addition, the parties use "Peachtree" throughout their statements of material fact and briefs and do not explain to which entity they are referring.  (See, e.g., Pl. SMF II ¶ 69).  In the discussion of arguments where the parties have used "Peachtree," the undersigned has assumed they are referring to "The Peachtree Companies, Inc." Similarly, the parties have referred to "Weather Shield" without explaining to which entity or entities they are referring.  For purposes of this Report and Recommendation, however, whether the parties are referring to "Weather Shield, Inc." or "Weather Shield Mfg., Inc." is immaterial.

At all times relevant to this lawsuit, the Peachtree Doors and Windows facility, or plant, in Gainesville, Georgia, manufactured doors and, among other things, double hung and casement windows, which are referred to in this Report and Recommendation as the "300 series" windows.  (Steinhafel Dep. at 30, 49; Doan Dep. at 7, 28, 33, 35, 57).   Earl Doan was the plant manager for the Gainesville facility and he reported to Art Steinhafel, the Chief Operating Officer for the Peachtree Companies, who in turn reported to Kevin, Mark and Lee Schield.  (Doan Dep. at 6-7, 15, 86-87; Steinhafel Dep. at 7; Ex. 13 to Doan Dep.).

Plaintiffs, who are all non-Hispanic persons (Pl. SMF II, ¶ 7), were employed at the PDW facility in Gainesville until they were laid off in April or May 2007. (See Def. SMF, ¶¶ 3-4, 8; Pl. SMF II, ¶ 8).  At the time of the layoffs at issue, the plant employed approximately 50 Hispanic persons and approximately 263 non-Hispanic persons.  (See Doc. 249-38 at 2).

### 2.   The Organization of the Gainesville Facility

The Gainesville plant was organized by units often referred to as "departments," and "area managers" generally supervised multiple departments. (Doan Dep. at 27-29; Steinhafel Dep. at 32-34; Ex. 13 to Doan Dep.).   An organizational chart for the facility shows that the area managers for "Doors" were Terry Adams and Wayne Brown, and the area managers for "Windows" were Rex Carlyle, Lloyd Little and Ricky Walden.   (Ex. 13 to Doan Dep.).   Although employees were typically assigned to work in one department (Ellis Dep. at 70-71),

17

employees were frequently moved to other departments as needed, even between "Doors" departments and "Windows" departments (see Doan Dep. at 31; Little Dep. at 112; Ellis Dep. at 62-63).   In addition to departments which were "specifically designated for particular products," the "specials" department made both windows and doors, and the glass department made glass for both doors and windows.  (Steinhafel Dep. at 30).

### 3.    The April/May 2007 Layoffs at Issue

Kevin Schield testified that he and Steinhafel decided to move the 300-series from the Gainesville plant to the SNE plant (part of Peachtree Companies) in Mosinee, Wisconsin, and that the Schield family later decided to close the Gainesville plant, due to declining sales volume and transportation costs.  (K. Schield Dep. at 14-15, 23, 26-29; see also Steinhafel Dep. at 45-49).  Mark Schield explained: "The housing industry began to decline at a very steady rate starting in 2007; and since then, the housing industry and ourselves have been in the process of making a lot of changes."  (M. Schield Dep. at 19).

Doan testified that, two months prior to the layoffs at issue, Steinhafel told him the window "lines" were being moved "up north," and that "we didn't have enough business to keep the plant running; that they had additional or open capacity up north to take them in."   (Doan Dep. at 21-23).  Steinhafel told Doan he had to reduce the "head count" at the factory.   (Doan Dep. at 24, 36).  Steinhafel did not give Doan any guidance, and the company did not provide him any documents, about how to conduct a reduction-in-force. (Doan Dep. at 24, 37,

39; Steinhafel Dep. at 50, 61).  Doan testified that he went to HR manager David

Ellis for guidance:

> [I] asked him what was the best way to handle this.  I told him what
> I thought was going to happen with the plant, that we were going to
> lose the business, and I wanted to maintain the best people possible.
> And he gave directions that we could lay off whomever we decided to
> lay off, that we didn't have to follow any type of seniority.

(Doan Dep. at 25, 36-37; <u>see also</u> Ellis Dep. at 11-12).

Rex Carlyle, who supervised many of the departments that were moved to

Wisconsin, testified that about a month before the layoff happened, Doan told him

that "they were shutting down the lines that [he] had," and "the plant would be

consolidated" to a plant up north, i.e., "moving stuff up north."  (Carlyle Dep. at

14-15; <u>see also</u> <u>id.</u> at 8-9).  Sometime later, Doan got the managers "together as

a group and told us everything that was happening and to be thinking about how

we were going to run the plant going through this crisis."  (Carlyle Dep. at 16-17).

Doan also told them that they "would be evaluating all employees in the plant, and

that he would be asking each one of [them] to evaluate all of [their] employees."

(Carlyle Dep. at 16-17).

Doan instructed the managers to provide rankings of the employees under

their supervision.  (Doan Dep. at 26-27).  According to Doan, the managers were

told that he "wanted them to use some criteria such as attendance, absenteeism

or attendance, attitude, job skill ability, performance, to grade, 1 being the best,

and the highest number being the worst."  (Doan Dep. at 26; <u>see also</u> <u>id.</u> at 37).

Doan testified that the managers were expected to "use [their] own judgment" to

19

assess subjective criteria such as "attitude," "job skill" or "performance" and that "[t]he only thing that was said as far as dos and don'ts was th[is], Choose your best people; attendance, attitude, job skill, performance, ability[.]" (Doan Dep. at 26-27, 37, 39).

Doan's testimony that managers were given those criteria appears to be in dispute, although several managers testified they were advised that the "best employees" should be kept.  For example, Lloyd Little testified that Doan did not tell him what factors to consider in ranking his employees; he just told Little to "[r]ank your employees based on their particular functions that they did." (Little Dep. at 41-42).  According to Little, Doan later told him "you can keep 14 people; make up your mind, choose your best people," and "[c]hoose your best qualified and/or specific needs people.  That's it." (Little Dep. at 41, 94).  Supervisors Michael Jarrard and Sung Le also testified that Doan did not tell him what criteria to use to rank their employees.  (Jarrard Dep. at 9, 11; Le Dep. at 11).  Ricky Walden testified, "We were told from upper management that we are in a survival mode.  This company is in a survival mode, you all go pick your best players, to keep this plant in business." (Walden Dep. at 23; <u>see also</u> <u>id</u>. at 25).  Kevin Coggins testified, "We were told the 300 series would be shutting down, and there are good employees in that area, so we were asked to rank our employees, and take the bad from - - take the good, and replace the bad.  We wanted to keep the best employees possible to run what we had left to run in the plant." (Coggins Dep. at 15).

The managers and supervisors conducted their rankings (see Doc. 244-48); each manager or supervisor ranked employees in each department only against employees in that department.  (Doan Dep. at 38-39; Coggins Dep. at 17-18; Walden Dep. at 28-29).  There is evidence that Doan and the managers met and discussed which employees should be retained and in which departments.  (Doan Dep. at 38, 102, 104; Carlyle Dep. at 44; Coggins Dep. at 31-34).[14]  According to Doan, they considered the ranking sheets, and they "kind of compared everybody to everybody else[.]"  (Doan Dep. at 104; see also Coggins Dep. at 32-33).  To the best of Carlyle's recollection, "the area managers wanted people that had already c[o]me and worked for them that had experience."  (Carlyle Dep. at 46).  They asked him about employees they did not know (who worked under his supervision), and he gave them his "evaluation of that employee, what kind of employee they were."  (Carlyle Dep. at 46; see id. at 68).  Doan testified that the goal was to keep the best people at the plant, regardless of the department in which they worked.  (Doan Dep. at 104).  Doan explained that the persons who were laid off were compared against everybody, but he cannot say now why each employee who was retained was better than each person who was let go.  (Doan Dep. 121-22).  The discussions between Doan and the managers were written on a whiteboard, which was erased, and no notes of these discussions were retained.  (Doan Dep. at 103, 105, 107-08).  Although there appears to be some dispute over

---

[14] Some managers (or supervisors) testified that they did not participate in such a meeting.  (See, e.g., Little Dep. at 92-94; Le Dep. at 10-11).

the degree to which area managers made decisions about which employees to retain, there is evidence that Doan made the ultimate decisions about which employees to lay off.  (See Def. Resp. to Pl. SMF II, ¶ 57; see also Adams Dep. at 23).

In late April/early May, 2007, production of the 300 series was shut down in Georgia and moved to Wisconsin.  (Pl. SMF II, ¶ 5).  Portions of departments that provided support to the window lines were also moved.  (Doan Dep. at 33).  More than 50 employees, including Plaintiffs, were laid off at that time.  (See Pl. SMF II, ¶¶ 2, 8; Def. Resp. to Pl. SMF II, ¶ 8; Doan Dep. at 138).  It is undisputed that Defendants did not provide any plaintiff 60 days notice of the layoff.  (Pl. SMF II, ¶ 6; Def. Resp. to Pl. SMF II, ¶ 6; Doan Dep. at 40).

The Gainesville Peachtree Doors and Windows plant continued to make doors until early to mid-2008 and apparently closed at the end of August 2008. (See Doan Dep. at 7-8, 56-58).  Between July 2008 and the end of 2008, the financial operations of all of the companies owned by the Shield family, including Weather Shield and The Peachtree Companies, were consolidated  (Kuhn Dep. I at 55-56), and these companies now share a corporate headquarters (Kuhn Dep. II at 13).  PDW, The Peachtree Companies and SNE, i.e., the entire Peachtree companies, were purchased by Weather Shield at the same time in or around 2009.  (Pl. SMF II, ¶ 77).[15]  John Kuhn, WSM's Director of Finance, testified in his

---

[15] Plaintiff cites Kuhn's deposition testimony at page 148 in support of Pl. SMF II ¶ 77. Kuhn testified that Weather Shield purchased PDW, The Peachtree Companies and SNE, but he did not state when that purchase occurred.  (Kuhn Dep. II at 148).  Defendants do not dispute Pl.

July 2009 deposition that Peachtree Doors and Windows was "still a separate legal entity" but did not do "anything," although "Peachtree" remained a brand. (Kuhn Dep. I at 5, 42-43).   In his March 23, 2010 deposition, Kuhn testified that Peachtree Doors and Windows had no employees. (Kuhn Dep. II at 154).  PDW's inventory and assets, including intellectual property, were transferred to Weather Shield, which now contracts with The Peachtree Companies, Inc. to manufacture Weather Shield products.  (Pl. SMF II, ¶ 79; Kuhn Dep. I at 43; Kuhn Dep. II at 54-55, 130).

## V.  <u>Summary Judgment Standard</u>

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary

---

SMF II ¶ 77, however.

judgment, he must respond by going beyond the pleadings, and by his own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial. See id. at 322, 324. A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted). It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter. Id. at 249, 255. Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The Eleventh Circuit has explained summary judgment as follows:

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Young v. Gen. Foods Corp., 840 F.2d 825, 828 (11th Cir. 1988) (quoting Celotex Corp., 477 U.S. at 322-23), cert. denied, 488 U.S. 1004 (1989). Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent

evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991) (citation omitted), cert. denied, 506 U.S. 952 (1992). The evidence "cannot consist of conclusory allegations or legal conclusions." Id. Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984).

"[T]he filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, '[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.' " Glenn v. Brumby, 724 F. Supp. 2d 1284, 1295 (N.D. Ga. 2010) (quoting Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004), cert. denied, 546 U.S. 816 (2005)). "The Eleventh Circuit has explained that '[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.' " Sun Life Assur. Co. v. Williams, No. 5:06-CV-139 (CAR), 2008 U.S. Dist. LEXIS 21117, at *14 (M.D. Ga. Mar. 18, 2008) (quoting United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)). "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." Sun Life

25

Assur. Co., 2008 U.S. Dist. LEXIS 21117, at *14 (citing Oakley, 744 F.2d at 155-56).

## VI.  Discussion

### A.  Defendants' Status as Plaintiffs' "Employer"

Plaintiffs argue that all Defendants are a "single employer" for purposes of Plaintiffs' Title VII and WARN Act claims and are jointly liable to Plaintiffs.  (Doc. 248-1, Pl. Br. at 18).  Plaintiffs argue that: (1) Defendants "are 'highly integrated with respect to [their] ownership and operations and should be treated as a single, integrated enterprise for purposes of Title VII'"; (2) Defendants "are similarly a 'single employer' for purposes of Plaintiffs' WARN claim"; and (3) "[t]he Weather Shield defendants are liable as successors of PDW."  (Id. at 19, 26, 27).

Defendants contend that they are not a single employer, and they appear to argue that only PDW should be considered Plaintiffs' employer for purposes of Plaintiffs' claims.  (See Doc. 253, Def. Resp. at 22-26).[16]  In their Fifth Defense, Defendants assert that "Plaintiffs were not employed by The Peachtree Companies, Inc. (Wisconsin), The Peachtree Companies, Inc., SNE Enterprises, Inc., Weather Shield Mfg., Inc. or Weather Shield, Inc."  (See Doc. 16 at 3).

### 1.  Whether Defendants are an "Integrated Enterprise" for Purposes

---

[16] Defendants do not seek summary judgment on this ground (see generally Doc. 244-1, Def. Br.); they simply argue in  response to Plaintiffs' motion for summary judgment that only PDW was Plaintiffs' employer.  (See Doc. 253, Def. Resp. at 22-26).

**of Plaintiffs' Title VII Claim**[17]

The integrated enterprise test is used to determine whether " 'two ostensibly separate entities are highly integrated with respect to ownership and operations,' and therefore may be counted as one entity under a Title VII claim." Kolczynski v. United Space Alliance, LLC, No. 6:04-cv-716-Orl-18KRS, 2005 U.S. Dist. LEXIS 20508, at *10-11 (M.D. Fla. Sept. 20, 2005) (quoting Lyes v. City of Riviera Beach, 166 F.3d 1332, 1341 (11th Cir. 1999)).  "The test used to determine whether two companies should be treated as a single employer in this manner was . . . first used by the Supreme Court in a labor relations context." Kolczynski, 2005 U.S. Dist. LEXIS 20508, at *11 (citing Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc., 380 U.S. 255, 256 (1965)).  Under this test, a court considers the following four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."  Lyes, 166 F.3d at 1341.

The undersigned finds that there is evidence of common management, ownership and financial control of the defendant companies, and evidence of interrelation of operations.  For example, according to Defendants' 2006

---

[17] Plaintiffs do not address whether Defendants are a "single employer" for purposes of their § 1981 claim, but the undersigned notes that "[t]he test for whether a company is an 'employer' is the same under Title VII and § 1981." Hackett v. United Parcel Serv., Inc., No. CV 98-J-0030-S, 1999 U.S. Dist. LEXIS 21602, at *10-11 (N.D. Ala. Apr. 23, 1999) (citing Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)); see also Cooper v. Southern Co., 260 F. Supp. 2d 1295, 1298 n.1 (N.D. Ga. 2003) ("The analysis of whether a party is an employer appears to be the same under Title VII and § 1981."), aff'd, 390 F.3d 695 (11th Cir. 2004) (finding plaintiff could not pursue § 1981 claim against defendant who was not her "employer" under Title VII).

organizational chart, the "leadership" of the defendant companies, Lee Schield, Mark Schield and Kevin Schield, served dual roles; they worked for the Peachtree Companies (PDW and SNE) and the Weather Shield defendants. (Pl. SMF II, ¶ 67). Of the 14 members of the "executive team," 9 similarly served in dual roles. (Pl. SMF II, ¶ 68). Peachtree Companies employees performed work for the Weather Shield defendants, but they were paid by and accounted for as only Peachtree Companies employees and vice versa. (Pl. SMF II, ¶ 69). A Weather Shield company would never compensate a Peachtree company for a "borrowed" employee because "[i]t went both ways." (Pl. SMF II, ¶ 69). No company ever identified any transaction on any balance sheet that accounted for the value of an employee who technically worked for one company but performed services for another. (Pl. SMF II, ¶ 69). Defendants are also "under the same insurance umbrella"; they combined financial statements in 2006; and they are all represented in this lawsuit by the same lawyers. (Pl. SMF II, ¶ 70). In addition, job openings across all the Schield Family Companies were posted on the Web site, and the Web site address appears on the face of the 2006 hourly plant handbook for PDW. (Pl. SMF II, ¶ 72). The 2006 handbook also refers to PDW as a "Schield Family Company." (Pl. SMF, ¶ 74). Furthermore, Tina Check, a Human Resources Manager, supervised both Peachtree and Weather Shield employees. (Pl. SMF, ¶ 75).

Defendants' argument that they are not a single employer is as follows:

28

> [T]he employment decisions at issue were made exclusively by PDW.
> There is no evidence in the record to establish that any of the
> decisions impacting Plaintiffs' positions with PDW were made by
> anyone outside of PDW. In addition, Weather Shield did not maintain
> control over day to day employee relations issues and decisions, such
> as discipline, hiring, or firing. (DSAF ¶ 445).

> Moreover, PDW owned the facility in Gainesville, Georgia, not
> Weather Shield. (DSAF ¶ 446). Though the Schield Family owned a
> majority of PDW, control over operations of PDW was centered with
> Art Steinhafel, COO of PDW. (DSAF ¶ 440). While PDW and Weather
> Shield manufactured doors and windows, each manufactured distinct
> products and each served different markets. (DSAF ¶ 447). In
> addition, PDW maintained a separate accounts payable supervisor,
> a separate credit and collection manager, and a separate controller.
> (DSAF ¶ 448). PDW also maintained a separate marketing
> department. (DSAF ¶ 448). At the time of the layoffs, PDW had
> maintained its own payroll. (DSAF ¶ 540). Furthermore, the
> corporate headquarters for PDW and Weather Shield were located in
> different cities. (DSAF ¶ 439). And finally, PDW maintained separate
> audited financial statements. (DSAF ¶ 442).

(Doc. 253, Def. Resp. at 23-24).

What emerges from the record is a multiplicity of facts supporting both sides

of the single employer issue. There is evidence of common ownership and

management, and some evidence of interrelationship of the company operations,

although the extent of that interrelatedness appears to be in dispute.

Furthermore, whether and to what extent Defendants other than Peachtree Doors

and Windows controlled employment decisions, such as hiring, discipline and

termination, is unclear, given the parties' presentations. In <u>Lyes</u>, the court

explained that "[u]seful 'indicia of control' may be drawn from the agency context,

including: 'the authority to hire, transfer, promote, discipline or discharge; the

authority to establish work schedules or direct work assignments; [and] the obligation to pay or the duty to train the charging party.' " 166 F.3d at 1345 (quoting <u>Oaks v. City of Fairhope, Ala.</u>, 515 F. Supp. 1004, 1035 (S.D. Ala. 1981)). However, the parties have failed to point to record evidence establishing without dispute that, with respect to Plaintiffs, the owners and managers of each of the defendant companies did or did not possess or exercise "the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments; [and] the obligation to pay or the duty to train."

The undersigned finds that Plaintiffs have failed to demonstrate the absence of a genuine issue of material fact on the factors relevant to whether Defendants were an integrated enterprise for purposes of the Title VII claim. Thus they have not shown that they are entitled to summary judgment on the issue of whether all Defendants should be considered a single employer for purposes of Plaintiffs' Title VII (and § 1981) claims. Therefore, it is **RECOMMENDED** that Plaintiffs' motion for summary judgment on the issue of whether all Defendants were Plaintiffs' "employer" be **DENIED**.[18]

### 2.   <u>Whether Defendants are a "Single Employer" for Purposes of Plaintiffs' WARN Act Claim</u>

---

[18] To the extent that Defendants' arguments in response to Plaintiffs' motion can be construed as a motion for summary judgment on the employer issue, it is also **RECOMMENDED** that their motion be **DENIED**.

Plaintiffs argue that "[t]he defendant companies are similarly a 'single employer' for purposes of Plaintiffs' WARN claim." (Doc. 248-1, Pl. Br. at 26).

The WARN Act implementing regulations provide:

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2). These factors are the same as those discussed *supra* in the analysis of whether Defendants are a single employer for purposes of Plaintiffs' Title VII claim. Therefore, for the reasons already discussed, the undersigned **RECOMMENDS** that Plaintiffs' motion for summary judgment on the issue of whether all Defendants were Plaintiffs' employer for purposes of their WARN Act claim be **DENIED**.

### 3. <u>Successor Liability</u>

Plaintiffs also argue that "[t]he Weather Shield Defendants are liable as successors of PDW." (Doc. 248-1, Pl. Br. at 27).[19]

"The general rule of successor corporate liability is that, when one

---

[19] Citing to Kuhn's deposition at page 148 (Doc. 248-1, Pl. Br. at 28 n.13), Plaintiffs assert that Weather Shield purchased PDW in or around 2009. However, as noted above in footnote 15, the cited testimony does not indicate when that purchase occurred.

corporation sells its assets to another, the latter is not responsible for the seller's debts or liabilities absent an express or implied agreement to assume specific obligations." Desporte-Bryan v. Bank of Am., 147 F. Supp. 2d 1356, 1362  (S.D. Fla. 2001) (citing Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182 n.5 (1973); Preyer v. Gulf Tank & Fabricating Co., Inc., 826 F. Supp. 1389, 1395 (N.D. Fla. 1993)).  "However, in the context of the employee/employer relationship, courts have recognized that congressional policies against unfair and discriminatory labor practices embodied in statutes such as the National Labor Relations Act ("NLRA"), Title VII, and Section 1981 override common law rules of successor liability."  Desporte-Bryan, 147 F. Supp. 2d at 1362 (citations omitted).

> The case law articulates several factors that the court must consider in determining the applicability and appropriateness of successor liability.  These factors are: (1) whether the successor employer had prior notice of the claim against the predecessor; (2) whether the predecessor is able, or was able prior to the purchase, to provide the relief requested; and (3) whether there has been sufficient continuity in the business operations of the predecessor and the successor to justify imposition of liability.

Id. (citing Preyer, 826 F. Supp. at 1395).  "The first two factors . . . are critical to the imposition of successor liability.  The successor doctrine is derived from equitable principles, and it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." Musikiwamba v. ESSI, Inc., 760 F.2d 740,

750 (7th Cir. 1985).

> The final factor includes such things as: (a) whether the new employer uses the same plant; (b) whether it uses the same or substantially the same work force; (c) whether it uses the same or substantially the same supervisory personnel; (d) whether the same jobs exist under substantially the same working conditions; (e) whether the successor uses the same machinery, equipment, and methods of production; and (f) whether he produces the same product.

Desporte-Bryan, 147 F. Supp. 2d at 1362 (citing Preyer, 826 F. Supp. at 1395-96; Musikiwamba, 760 F.2d at 750).  "The test is fact specific and must be conducted in light of the facts of each case and the particular legal obligation which is at issue."  Desporte-Bryan, 147 F. Supp. 2d at 1362-63 (citing In re Nat'l Airlines, Inc., 700 F.2d 695, 698 (11th Cir.), cert. denied, 464 U.S. 933 (1983)).

Defendants do not dispute "that the Weather Shield Defendants had notice of the claim against PDW," and that "PDW has in place an insurance policy and a reserve fund for liability protection," and thus, Plaintiffs have satisfied the first two factors for determining successor liability.  (Doc. 253, Def. Resp. at 24-25). Defendants argue, however that Plaintiffs have not satisfied the third factor, i.e., "whether there has been sufficient continuity in the business operations of the predecessor and the successor to justify imposition of liability[.]"  (Id. at 25). Defendants assert that "the PDW Gainesville facility is completely shutdown"; "the work force of which Plaintiffs were a part is no longer in existence"; "the employment of Plaintiffs' supervisors did not survive the PDW shutdown"; "there

are no jobs in the Gainesville facility," and "therefore, the same jobs do not exist under the same or similar working conditions"; and "while the Weather Shield Defendants still manufacture windows and doors, they do so with only minimal amounts of the same equipment, and manufacture different products with very limited exception." (Id. at 25-26).

Plaintiffs, on the other hand, argue that "almost all of [PDW's] assets and inventory have been transferred to WSM, which using some of the former employees of PDW (including supervisors Ricky Walden and Kevin Coggins)[,] now manufactures products under the 'Peachtree Brand.'" (Doc. 248-1, Pl. Br. at 28). Pointing out that WSM and PDW have the same owners and boards of directors, Plaintiff contends that "[i]n a very real sense, WSM simply stepped into the shoes of PDW and succeeded in the former's interests." (Id. at 29).

The undersigned finds that Plaintiffs are not entitled to summary judgment on the issue of whether the Weather Shield defendants should be held liable as a "successor" to PDW because there are genuine issues of material fact on the third relevant factor, i.e., "whether there has been sufficient continuity in the business operations of the predecessor and the successor to justify imposition of liability." Desporte-Bryan, 147 F. Supp. 2d at 1362. The parties have not pointed to evidence that establishes that element, or refutes it, without dispute.

Accordingly, it is **RECOMMENDED** that summary judgment be **DENIED** on Plaintiffs' motion for summary judgment on the issue of whether the Weather

Shield defendants should be held liable as a "successor" to Defendant PDW.

**B.    Plaintiffs' Title VII and § 1981 Race and National Origin Claims (Counts I and II)**

Plaintiffs contend that they are entitled to summary judgment on these claims, as do Defendants.

### 1.    Analytical Framework for Disparate Treatment Claims

Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).   Section 1981 of 42 U.S.C. provides:

Equal rights under the law

> (a) **Statement of equal rights.**  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

> (b) **"Make and enforce contracts" defined.**  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

> (c) **Protection against impairment.**  The rights protected by this section are protected against impairment by nongovernmental

discrimination and impairment under color of State law.

Claims under § 1981 and Title VII "have the same requirements of proof and use the same analytical framework," Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998), and the undersigned's analysis of Plaintiffs' race and national origin discrimination claims thus applies to both their Title VII claims and their § 1981 claim.

A Title VII plaintiff may establish a *prima facie* case of discrimination through circumstantial evidence under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981):[20]

> [A] plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) [s]he belongs to a racial minority; (2) [s]he was subjected to adverse job action; (3) h[er] employer treated similarly situated employees outside h[er] classification more favorably; and (4) [s]he was qualified to do the job.

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); accord Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1310-11 (11th Cir.), modified, 151 F.3d 1321 (11th Cir. 1998).

If a plaintiff presents a *prima facie* case through circumstantial evidence, "the defendant must 'articulate some legitimate, nondiscriminatory reason for the

---

[20] The method of proving unlawful discrimination using the burden-shifting scheme discussed below is frequently referred to as the McDonnell Douglas or McDonnell Douglas/Burdine framework or burden-shifting analysis. See, e.g., Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1315 (11th Cir. 2002); Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 510 (11th Cir. 2000).

[adverse employment action].' " <u>Bessemer</u>, 137 F.3d at 1310 (quoting <u>McDonnell</u> <u>Douglas</u>, 411 U.S. at 802).  If the defendant satisfies this rebuttal burden by producing evidence of a legitimate rationale for its decision, "the plaintiff may attempt to show that the proffered reason was merely a pretext for the defendant's acts." <u>Bessemer</u>, 137 F.3d at 1310 (citing <u>Burdine</u>, 450 U.S. at 253).  In <u>Burdine</u>, the Court explained the next step, once the defendant employer articulates a legitimate, non-discriminatory reason for the employment decision:

> [The plaintiff] now  must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.  This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.  She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

<u>Burdine</u>, 450 U.S. at 256.  The Supreme Court explained further in <u>St. Mary's</u> <u>Honor Ctr. v. Hicks</u>, 509 U.S. 502, 508-09 (1993), that the jury's disbelief of the employer's proffered explanation does not mandate a finding of intentional discrimination but rather *permits* the jury to make that finding.  The Court elaborated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination[.]

<u>Id.</u> at 511 (footnote omitted)(emphasis in original);  <u>accord</u> <u>Hall v. Ala. Ass'n of</u>

School Bds., 326 F.3d 1157, 1167 (11th Cir. 2003)("[T]he mere disbelief of the employer's proffered reason does not 'compel' a finding of discrimination.").

### 2.    Plaintiffs' *Prima Facie* Case

Plaintiffs do not argue that they have produced direct evidence of race and national origin discrimination, but instead, analyze their claims using the McDonnell Douglas/Burdine burden-shifting framework. (See Doc. 248-1, Pl. Br. at 7-18).[21]

In reduction-in-force cases, a plaintiff establishes a *prima facie* case of discrimination by:

> "(1) showing that [she] was a member of a protected group and was adversely affected by an employment decision, (2) proving that [she] was qualified for [her] position or to assume another position at the time of discharge; and (3) producing sufficient evidence from which a rational fact finder could conclude that [her] employer intended to discriminate against [her] in making the discharge decision."

Lawyer v. Hillcrest Hospice, Inc., 300 F. App'x 768, 772-73 (11th Cir. 2008) (unpublished decision) (quoting Standard, 161 F.3d at 1331. "To establish intent, [the plaintiff] need[s] to proffer evidence that could lead a fact finder to conclude that '(1) [the] defendant consciously refused to consider retaining a plaintiff because of his [race or national origin], or (2) [the] defendant regarded [race or national origin] as a negative factor in such consideration.' " Padilla v. N. Broward

---

[21] Defendants argue that Plaintiffs cannot bypass McDonnell Douglas and rely on evidence of a "pattern and practice" of discrimination because "pattern and practice evidence is limited to suits brought by the government or those brought as class actions." (Doc. 244-1, Def. Br. at 5-6). Plaintiffs do not appear to argue that there was a "pattern and practice" of discrimination, however.

Hosp. Dist., 270 F. App'x 966, 971 (11th Cir. 2008) (unpublished decision) (quoting Allison v. Western Union Tel. Co., 680 F.2d 1318, 1321 (11th Cir. 1982)).

### a.    Protected Class and Adverse Employment Action

Plaintiffs have shown that they are members of a protected class, i.e., non-Hispanic,[22] and that they were adversely affected by an employment decision, i.e., they were all laid off.  Defendants do not dispute these showings.  Thus, Plaintiffs have satisfied the first element of their *prima facie* case.

### b.    Qualified

With respect to the "qualified" element of Plaintiffs' *prima facie* case, Defendants do not address in their initial brief in support of their motion for summary judgment whether Plaintiffs were qualified for the positions that remained at the plant after the April/May 2007 layoffs.  They do not identify the qualifications required for the remaining positions, and they do not point to evidence that shows Plaintiffs were not qualified.[23]

---

[22] See Booth v. Pasco Cnty., No. 8:09-CV-02621-T-30TBM, 2010 U.S. Dist. LEXIS 80287, at *26 (M.D. Fla. July 13, 2010) (explaining that "[t]he common use of the term 'Hispanic' has blurred the line between race and national origin discrimination" (citing Salas v. Wis. Dep't of Corr., 493 F.3d 913 (7th Cir. 2007))).

[23] In their reply, Defendants argue that Plaintiffs have not shown that they were qualified for the remaining positions (Doc. 272, Def. Reply at 2-3).  However, those arguments are made for the first time in their reply brief, and this court, and others, routinely decline to consider arguments supporting a motion for summary judgment that are made for the first time in the movant's reply brief.  The undersigned declines to do so as well.  See, e.g., Vurv Tech. LLC v. Kenexa Corp., No. 1:08-cv-3442-WSD, 2009 U.S. Dist. LEXIS 61623, at *22-23 n.7 (N.D. Ga. July 20, 2009) (declining to consider arguments that "were initially raised only in Defendants' reply brief").

Defendants also argue for the first time in their reply that, to the extent a particular Plaintiff's job was not eliminated, Plaintiff must show that he or she was replaced by someone

Plaintiffs contend that they were qualified for the positions that remained after the layoffs because those positions were either held by Plaintiffs prior to their layoffs, or, to the extent that some Plaintiffs' positions were eliminated, they had previously worked in the remaining positions or had experience that qualified them to work in those positions.   (See Doc. 248-1, Pl. Br. at 8-13).

Although those Plaintiffs whose positions remained following the layoffs have arguably shown that they were qualified for those positions, no party has clearly pointed to evidence of the qualifications required for the positions remaining following the layoffs, or undisputably shown that each Plaintiff was or was not qualified for those remaining positions.  There is, however, evidence that employees were often moved around from department to department, and that, as part of the layoff decision making, managers compared all employees against each other to determine which employees would remain, and in which department. Therefore, the undersigned finds that there is a genuine issue of fact on whether all Plaintiffs meet the "qualified" element of their *prima facie* case.

### c.   **Intent to Discriminate**

---

outside his or her protected class.  (Doc. 272, Def. Reply at 5).  However, the *prima facie* formulation for a reduction in force claim does not require that a plaintiff show he or she  was replaced.  Defendants also argue in their reply that "Plaintiffs' failure to establish that someone outside of their protected class was retained in a position for which they were qualified defeats their claims." (Id. at 5-6).  Again, the court will not consider arguments made initially in a reply brief.  In Defendants' motion for summary judgment, the only element Defendants contested was the last element, i.e., whether there was evidence from which a factfinder could reasonably conclude that Defendants intended to discriminate in making the layoff decisions.  Defendants could have argued in their initial summary judgment brief that Plaintiffs cannot satisfy other elements, including the "qualified" element, or the "replacement" element (if there were such an element), but Defendants waited until their reply brief to do so.  Therefore, the court will not consider those arguments.

The parties' central dispute revolves around whether Plaintiffs can satisfy the last element of their *prima facie* case, i.e., whether Plaintiffs have pointed to evidence from which a reasonable fact finder could find that Defendants intended to discriminate against them in making the layoff decisions.

Plaintiffs argue that they can satisfy this element: "Plaintiffs have shown that each of them was replaced by or otherwise lost a position to an individual outside of the protected class because Plaintiffs have shown (and Defendants admit that) numerous Hispanic employees were not laid off when Plaintiffs were laid off," and "Doan testified that each employee working at the plant was compared to each of the other employees for purpose of determining who would be retained." (Doc. 257, Pl. Resp. at 6-7). Defendants contend that "no Plaintiff has identified a specific Hispanic employee that was kept that should have been laid off because the Hispanic employee was less qualified," and that "[s]imply concluding that Plaintiffs were better qualified, without support, is insufficient to withstand Defendants' motion, especially in the face of the substantial evidence Defendants have presented as to why each Plaintiff was selected as part of the layoff." (Doc. 244-1, Def. Br. at 7-8).

The undersigned finds that the question whether Defendants intended to discriminate against the plaintiffs in making the layoff decision must also go to a jury. It is important to note, first, that "relative qualifications" is not an element of Plaintiffs' *prima facie* case. See <u>Lawver</u>, 300 F. App'x at 772-73. Thus any

41

consideration of "relative qualifications" is more appropriate in the analysis of Defendants' explanation of their reasons for the layoff decisions and the consideration of whether that explanation is a pretext for prohibited discrimination.

Moreover, while proof that a plaintiff was replaced by a person outside his or her protected class can be evidence of discriminatory intent, it is by no means the only way to show such intent, and it is not necessary to make that showing in order to survive summary judgment in a reduction in force case. See Lawver, 300 F. App'x at 772-73; Padilla, 270 F. App'x at 971. The parties have not pointed to evidence clearly showing that each Plaintiff was, or was not, replaced by a person outside of his or her protected class. Some Plaintiffs' positions were eliminated, and other Plaintiffs' positions were filled with other employees who may or may not have been outside Plaintiffs' protected class. Although several Hispanic employees were retained, it appears that far more non-Hispanic employees were retained. (See Doc. 249-38). To the extent that there was an alleged statistical disparity between the number of Hispanic and non-Hispanic employees who were laid off, that contention is discussed *infra*.

Plaintiffs have pointed to other evidence that does present a jury question on the intent issue, however. They cite (1) alleged comments by Earl Doan that evidence a preference for Hispanic employees; (2) evidence of preferential treatment of Hispanic employees; and (3) statistical evidence. (Doc. 257, Pl. Resp.

at 7-12).  Because at least in combination they are sufficient to create a jury question, the undersigned addresses only Doan's alleged comments and the statistical evidence.

### i.  __Doan's Alleged Comments__

Plaintiffs have pointed to the testimony of several employees that Doan made comments evidencing a preference for Hispanic employees, including a 2005 or 2006 comment that " 'if he had it his way, he would only have Hispanics working for the company' " (Gee Dep. at 135-38 (quoting "Def. Ex. 1")); a 2007 statement that "if he had his way, the whole plant would be Hispanic" (Crocker Dep. at 68-70); a statement that "if he had his way, he would fire everybody and hire all Mexicans" (Sutton Dep. at 93); a 2007 statement that "he preferred to have Hispanics working for the company," that "they have Hispanic workers[ and h]e said the job probably gets done."   (Carruth Dep. at 56-57); and a pre-2005 statement "that he would rather hire Mexicans than most of the white and black people he had because the Mexicans did not complain and did not fuss."  (Poole Decl., Pl. Ex. K to Doc. 257 (Doc. 257-12), ¶¶ 2, 5).

Defendants contend that evidence of a statement by Doan "to the effect that he would prefer to have more Hispanics at the plant"[24] is "not sufficient circumstantial evidence of bias to provide a reasonable basis for a finding of discrimination" because it was a "stray remark" and "unrelated to the decisional

---

[24] Defendants assert that Doan denies making the statement, but they do not cite to the record in support of that assertion.  (Doc. 244-1, Def. Br. at 10).

process itself." (Doc. 244-1, Def. Br. at 10-11). They also contend that these comments were not made close in time to the layoff decisions and were unrelated to the layoff decisions. (Id. at 11).

While these alleged comments appear to be unrelated to the layoff decisions at issue and therefore do not constitute direct evidence of discrimination, see Rojas v. Florida, 285 F.3d 1339, 1342-43 (11th Cir. 2002) ("Remarks such as this one -- isolated and unrelated to the challenged employment decision -- are not direct evidence of discrimination."), they can "contribute to a circumstantial showing of discriminatory intent," id. at 1343 (citing Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998)). The undersigned finds the testimony about Doan's alleged comments concerning his preference for Hispanic employees to constitute circumstantial evidence of discriminatory intent.

Defendants rely on a comparative justification to explain how Doan (allegedly with input from his managers) made the layoff decisions, but Defendants did not document the comparative justification and the persons involved in making the layoff decisions, including Doan, have a limited memory of the decision making process with respect to each person retained and each person terminated. In light of these evidentiary gaps, Doan's alleged comments evidencing a preference for Hispanic employees are circumstantial evidence of an intent to discriminate in making the layoff decisions, even though the comments were not necessarily made contemporaneously with or in relationship to the

decisions at issue.  Whether the evidence of Doan's comments is uncontroverted is unclear from the presentations of the parties and the court's review of the record; therefore, the undersigned finds that this evidence at least creates an issue of fact on the discriminatory intent element of Plaintiffs' *prima facie* case.

## ii.   <u>**Statistical Evidence**</u>

Plaintiffs have presented expert opinion evidence, i.e., the expert report of Dr. Martin Shapiro (Pl. Ex. M to Doc. 257 (Doc. 257-14)), that a statistically significant disparity exists between the number of Hispanic employees and the number of non-Hispanic employees who were laid off, and Plaintiffs argue that this disparity "establishes an inference of discrimination."  (Doc. 257, Pl. Resp. at 10-12).[25]   Plaintiffs' statistical evidence is not uncontroverted, however. Defendants have also presented the opinion of an expert, Dr. Christopher Erath, who opines that "[t]here is no statistical support for a claim of discrimination by 32 plaintiffs."  (Doc. 249-38 at 3).  The undersigned finds that Plaintiffs' statistical evidence may be probative of discriminatory intent and that a jury must make that determination.[26]

Accordingly, the undersigned finds that no party has shown the absence of triable facts on Plaintiffs' *prima facie* case of discrimination.  Genuine issues of

---

[25] Defendants argue that "statistical evidence alone may never establish a prima facie case of individual disparate treatment."  (Doc. 244-1, Def. Br. at 6).  Plaintiffs do not rely on statistics alone, however.

[26] The undersigned makes no finding that the reports and testimony of the parties' experts satisfy the requirements of Fed. R. Evid. 702 or 703 or are otherwise admissible.

material fact remain in dispute with respect to whether each Plaintiff was qualified for a position or positions remaining after the layoffs and whether Defendants intended to discriminate in making the layoff decisions.

### 3.   Defendants' Articulated Legitimate, Non-Discriminatory Reason for Terminating Plaintiffs

As noted, once a plaintiff has established his or her *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.   The employer's burden to articulate a legitimate, non-discriminatory reason for its employment decisions is one of production, not persuasion,  Standard, 161 F.3d at 1331, and it is "exceedingly light."  Turnes v. Amsouth Bank, N.A., 36 F.3d 1057, 1060-61 (11th Cir. 1994) (internal quotation omitted).

Defendants have presented evidence that they decided to transfer the production of the 300 series windows to Wisconsin because of declining sales related to the collapse of the housing market and in order to save transportation costs, and that decision resulted in the layoffs at issue.  (See K. Schield Dep. at 14-15, 26; see also Steinhafel Dep. at 47).  The undersigned finds that Defendants have met their "exceedingly light" burden of articulating a legitimate, non-discriminatory reason for conducting a reduction in force in April/May 2007.

With respect to the particular layoff decisions, Defendants argue that "PDW management centered its layoff decisions on an effort to keep its best people."

46

(Doc. 244-1, Def. Br. at 12).[27]   Defendants have presented evidence that after Steinhafel informed Doan that he would need to lay off employees because the 300 series was being transferred, Doan advised his managers to rank their employees, and that the company wanted to keep the "best" employees in an effort to keep the plant open.  (See Doan Dep. at 25-27, 36-37, 39, 104; Carlyle Dep. at 16-17; Little Dep. at 41-42, 94; Walden Dep. at 23; Coggins Dep. at 15).  There is also evidence (although it appears to be disputed) that Doan advised his managers to rank their employees using such criteria as "attendance, . . . attitude, job skill ability[ and] performance," and Doan then made the layoff decisions after reviewing the rankings provided by his managers and supervisors, consulting with his managers and comparing employees against one another to determine which employees should remain. (Doan Dep. at 26, 38, 102, 104; Carlyle Dep. at 44, 46; Coggins Dep. at 21, 31-34).

Plaintiffs argue that "Defendants have produced no competent evidence in support of a legitimate, non-discriminatory reason for discharge." (Doc. 257, Pl. Resp. at 12).  They argue that, because Defendants decided whom to lay off by

---

[27] Citing Def. SMF ¶¶ 20-241, Defendants also assert, "As demonstrated in its Proposed Findings of Fact, Defendants relied on specific factors that led to the decision to lay off each individual Plaintiff." (Doc. 244-1, Def. Br. at 12-13).  However, most of those statements rely on Defendants' response to Interrogatory Number 88, which the undersigned has not considered, as discussed *supra*.  The court has reviewed the record, particularly the deposition testimony of the persons actually involved in the decisions at issue to determine what reasons were articulated by the decision makers.  See Burdine, 450 U.S. at 255 n.9 ("defendant cannot meet its burden merely . . . by argument of counsel"); see also Bates v. Greyhound Lines, Inc., 81 F. Supp. 2d 1292, 1302 (N.D. Fla.) ("A reason that a company or its lawyers conjures after-the-fact says nothing about whether a decision was impermissibly based on racial discrimination."), aff'd, 239 F.3d 369 (11th Cir. 2000).

comparing all employees with each other, "this would require Defendant–as part of its rebuttal burden–to provide admissible evidence of that comparative justification." (Id. at 13; see also Doc. 248-1, Pl. Br. at 14).  Plaintiffs contend that Defendants cannot do so because they have not presented such comparative justification in discovery, and the "identified decision-makers simply do not have that information." (Doc. 257, Pl. Resp. at 14; see also Doc. 248-1, Pl. Br. at 14-15).  Thus, Plaintiffs contend that they are entitled to summary judgment on their Title VII and § 1981 race and national origin discrimination claims. (Doc. 248-1, Pl. Br. at 7-18).

The undersigned finds that issues of material fact remain to be tried on whether Defendants have met their burden to articulate a legitimate, non-discriminatory reason for terminating Plaintiffs.  The undersigned acknowledges that Defendants have not provided specific information about each layoff decision, i.e., specific comparisons between each employee who was laid off and each employee who was retained.  However, as discussed *supra*, Defendants have provided information that, prior to the layoffs, Doan instructed his managers to rank their employees and advised them that he wanted to retain the "best" employees, based on certain criteria that appear to be in dispute, and that Doan then reviewed the rankings and received input from his managers concerning which employees to retain.  This evidence at least creates an issue of fact on whether Defendants' have articulated a legitimate, non-discriminatory reason for the layoff decisions.  See, e.g., McMath v. Bradley Indus., Inc., No. 99 C 3434,

2001 U.S. Dist. LEXIS  6570, at *8-9 (N.D. Ill. May 18, 2001) (rejecting the plaintiff's argument that the employer had "failed to articulate a legitimate, nondiscriminatory reason for its decision not to recall her and to later terminate her" because "[a]lthough there is a genuine dispute as to whether BI's  personnel have articulated a legitimate, non-discriminatory reason for BI's actions, the testimony of BI's personnel, albeit somewhat vague and confused, can be interpreted to articulate a good faith justification").

In McMath, the plaintiff, who had been laid off during a temporary reduction resulting from the shut down of production lines, alleged that her employer failed to recall her and terminated her because of her race in violation of Title VII and § 1981.  Id. at *1-2.    Both plaintiff and the defendant employer moved for summary judgment, but the court denied both motions.  Id. at *1, 20.  The court denied the plaintiff's motion, finding that a genuine issue of fact existed on the question whether the defendant had articulated a legitimate, non-discriminatory reason for its decision not to recall the plaintiff and later to terminate her.  Id. at *12.  The court noted that there were only two persons identified as being the decisionmakers, Fullriede and Bradley, and that there was "much dispute over the extent to which [the two men were] involved with the decision-making process and had knowledge of the reasons behind the decision."  Id. at *3.  The court found:

> The depositions [of Fullriede and Bradley] do not clearly describe the
> process by which BI decided whether to recall McMath and other
> workers.  Fullriede appears to say that Bradley, after consultation
> with him, made the decision about whom to recall, while Bradley

states that Fullriede was the primary decision-maker and that Fullriede kept Bradley apprised of his decisions.  Manifestly, Fullriede and Bradley have given somewhat confused testimony.  In any event, however, the evidence suggests that Fullriede and Bradley agree that both men participated in the decision regarding McMath.  It is also undisputed that no one else at BI participated in this decision. Furthermore, whether Fullriede or Bradley is credited with the final decision to recall someone, the two agree that the decision criterion for whether a worker was recalled was the extent to which she could operate multiple machines.  Using this criterion, the two claim that McMath did not fare well.

Id. at *11-12.  In McMath, Fullriede testified that Bradley asked him and others for input concerning the abilities of the laid-off workers and that Bradley advised Fullriede that "he was trying to decide who he was going to call back."  Id. at *9-10.  Fullriede also testified, "I believe it was based on their abilities," and he explained why he believed that the decision to recall workers was based on employees' abilities.  Id. at *10.  The court found that "[m]aking all reasonable inferences in favor of the non-moving party, BI, BI has presented sufficient deposition evidence to suggest that BI personnel can articulate a legitimate, non-discriminatory reason for not recalling and later terminating McMath"; therefore, the court denied the plaintiff's motion for summary judgment.  Id. at *12.

Similarly, in this case, Defendants have presented evidence that Doan considered the relative performances and job abilities of the persons laid off (including Plaintiffs) and the employees who were retained.  That evidence includes the deposition testimony of Doan and other area managers who gave input to Doan by providing rankings of employees who worked under them and

discussing those employees in a meeting with Doan prior to the layoffs.   Thus, construing the evidence in the light most favorable to Defendants as the non-moving party with respect to Plaintiffs' motion for summary judgment, the undersigned finds there is evidence that arguably demonstrates Defendants made the decisions at issue based on evaluations by Doan, with input from his area managers, of the relative qualifications and abilities of the employees and Doan's determination that the employees who remained represented "the best" employees. See Padilla, 270 F. App'x at 972 (noting that in a RIF case, the decision maker "explained that he considered the job skills of his department and determined the best way to consolidate tasks" and stating, "[t]his court has held that a subjective reason for an employer's action can be as legitimate as any other reason" (citing Chapman v. AI Transp., 229 F.3d 1012, 1033 (11th Cir. 2000) (en banc)).

The undersigned finds a case relied on by Plaintiffs, Whitfield v. Fulton County School District, No. 1:96-CV-3463-RWS (N.D. Ga. Nov. 9, 1999) (see Doc. 249-82),[28] to be distinguishable.  Plaintiffs assert that in Whitfield, ranking sheets were provided to a higher authority, but that "as in the Whitfield case, there is no evidence that these ranking sheets were at all relevant to the actual decision." (Doc. 257, Pl. Resp. at 17).  Whitfield involved a discriminatory failure to promote

_____

[28] In their response to Defendants' motion for summary judgment, Plaintiffs cite to a January 14, 2000 Order in the Whitfield case, attached as Exhibit O to their brief [Doc. 257-16]. The January 14, 2000 Order, however, is an order affirming the court's November 9, 1999 Order (which Plaintiffs included as an exhibit to their motion for summary judgment [Doc. 249-82]) and does not contain the substantive discussion of the ranking sheets to which Plaintiffs refer in their response brief [Doc. 257].

claim; in that case, the District Court found that "[t]here [was] no evidence in the record about the factors which the Superintendent actually considered in making his [promotion] recommendation" and no evidence that the Superintendent considered the rankings made by the applicant screening committee, or that "the opinions expressed by the committee members were ever conveyed to the Superintendent." (See Doc. 249-82 at 8). In this case, unlike in Whitfield, there is evidence of the factors Doan considered in making the layoff decisions: there is evidence that he considered the ranking sheets prepared by his managers and supervisors and that he considered the input of his managers when he compared employees to determine which were the "best" employees to keep.

Because there are genuine issues of material fact to be tried on whether Defendants have articulated a legitimate, non-discriminatory reason for selecting Plaintiffs to be laid off, the undersigned finds, as the court did in McMath, that Defendants are also not entitled to summary judgment.  In McMath, the court denied the defendant employer's motion for summary judgment, because of, among other reasons, the employer's "vague and confusing evidence as to the bases for its recall decisions[.]"  2001 U.S. Dist. LEXIS, at *19.  The court also noted that, although the employer relied on relative qualifications for its recall decisions, "[t]he relative qualifications of the employees involved can be judged only in relation to some standard, which is equivocal on this record." Id. Furthermore, the court found that, to the extent the employer "claim[ed] that the standard it applied was an individual's ability to operate multiple machines[,] . . .

no individual clearly took responsibility for the decision that was made, let alone articulated the standard by which he made it" and further "that even if this was the standard utilized, it may be questionable as a good faith justification since the evidence suggests that the recalled workers did not actually have to have the ability to operate multiple machines." Id. at *19 n.2.

Similarly, in this case, although there is evidence that plant manager Earl Doan decided which employees to retain and which to lay off based on input from his area managers, the evidence of how those decisions were made, and of the criteria used to make those decisions, is equivocal and confusing.  Resolving all inferences in favor of Plaintiffs as the non-moving party with respect to Defendants' motion for summary judgment, the undersigned finds that genuine issues of material fact remain to be tried, including whether Defendants have articulated a legitimate, nondiscriminatory reason for including each Plaintiff in the layoffs.  Moreover, to the extent that Defendants rely on the relative qualifications of Plaintiffs compared to the retained employees to justify the decisions at issue, the undersigned finds that there is a genuine issue of material fact on whether Defendants in fact relied on such a comparison, particularly given the absence of supporting documentary evidence, and the inability of Doan and the managers who gave input into the selection decisions to recall those comparisons.

**4.**    **Pretext**

If an employer meets its burden of articulating a legitimate, nondiscriminatory reason for its decision, a plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision" in order to survive summary judgment.  Chapman, 229 F.3d at 1024 (quoting Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 522 U.S. 1045 (1998)).  " 'To avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.' " Brooks v. Cnty. Comm'n, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993)).

The court's role at this juncture is to "evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs, 106 F.3d at 1538 (internal quotation omitted).  "[E]vidence sufficient to discredit a defendant's proffered nondiscriminatory reasons for its actions, taken together with the plaintiff's prima facie case, is sufficient to support (but not require) a finding of discrimination." Id. at 1535.  "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.' " Brooks, 446 F.3d at 1163 (quoting Hicks, 509 U.S. at 515).

54

The undersigned finds that genuine issues of material fact exist to be tried on whether Defendants' articulated reasons for terminating Plaintiffs are a pretext for race and national origin discrimination.  A reasonable jury could find that Defendants' explanation that the layoff decisions were based on a comparison of employees to determine who were the "best" was pretextual given the absence of testimonial or documentary evidence concerning the specific comparisons at issue, i.e., why Defendants selected certain employees, including Hispanic employees, to remain and selected others, including Plaintiffs, to be terminated. There appear to be disputes about the criteria that were relied on, how employees were ranked, who participated in the discussions about the layoffs, and how the ultimate layoff decisions were made.  These evidentiary gaps, coupled with the other evidence discussed in the analysis of Plaintiffs' *prima facie* case (including comments allegedly made by Doan that he preferred Hispanic employees and possibly statistical evidence) create a jury question on whether Defendants' articulated reasons are pretextual, and whether the real reason for the decisions was race and national origin discrimination.

In summary, the undersigned finds that a jury must decide whether Plaintiffs can satisfy their *prima facie* case, whether Defendants have articulated a legitimate, non-discriminatory reason for terminating Plaintiffs and whether Defendants' articulated reasons are a pretext for discrimination. Therefore, it is **RECOMMENDED** that Defendants' and Plaintiffs' motions for summary judgment [Docs. 244 & 248] be **DENIED** on Plaintiffs' Title VII and § 1981 race and national

origin discrimination claims (Counts I and II).

## C.   **Plaintiffs' WARN Act Claim (Count III)**

Plaintiffs allege that Defendants violated the WARN Act "by ordering a plant closing or mass layoff without providing sixty (60) days notice to Plaintiffs and prior to the expiration of 60 days following such order."  (Doc. 5, Am. Compl. ¶ 54).  Plaintiffs seek summary judgment on this claim, as do Defendants.

### 1.   **Applicable Provisions of WARN Act**

The WARN Act prohibits employers of 100 or more employees from ordering "a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order[.]"  29 U.S.C. § 2102(a); see also 29 U.S.C. § 2101(a)(1)(A).[29]  The employer is required to provide the written notice "(1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and (2) to the State or entity designated by the State to carry out rapid response activities

---

[29] Plaintiffs contend that a "plant closing," as defined by the Act and discussed *supra*, occurred, but they do not contend that a "mass layoff" occurred.  (See Doc. 248-1, Pl. Br. at 2).  The Act defines a "mass layoff" as:

> a reduction in force which—
> (A) is not the result of a plant closing; and
> (B) results in an employment loss at the single site of employment during any 30-day period for—
> (i)(I) at least 33 percent of the employees (excluding any part-time employees); and
> (II) at least 50 employees (excluding any part-time employees); or
> (ii) at least 500 employees (excluding any part-time employees)[.]

29 U.S.C. § 2101(a)(3).

56

under section 2864(a)(2)(A) of this title, and the chief elected official of the unit of local government within which such closing or layoff is to occur." 29 U.S.C. § 2102(a). "The purpose of the WARN Act is to 'provide protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs.' " Kephart v. Data Sys. Int'l, Inc., 243 F. Supp. 2d 1205, 1218 (D. Kan. 2003) (quoting 20 C.F.R. § 639.1(a)). "Advance notice allows workers and their families 'time to adjust to the prospective loss of employment, seek and obtain alternative jobs, and if needed, enter skill training or retraining programs.' " Kephart, 243 F. Supp. 2d at 1218 (quoting 20 C.F.R. § 639.1(a)).

The Act defines a "plant closing" as:

the permanent or temporary shutdown of a single site of employment, or one or more facilities **or operating units** within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees[.]

29 U.S.C. § 2101(a)(2) (emphasis added); see also 20 C.F.R. § 639.3(b). Department of Labor regulations define an "operating unit," for purposes of the WARN Act, as "an organizationally or operationally distinct product, operation, or specific work function within or across facilities at [a] single site." 20 C.F.R. § 639.3(j).

"Failure to provide a WARN Act notice subjects an employer to potential civil liability and civil penalties. Employers are potentially liable to each aggrieved

employee (who suffers an employment loss as a result of the closing or layoff) for back pay and for benefits under an employee benefit plan . . . , all calculated for the period of violation of the WARN Act up to a maximum of 60 days." Cashman v. Dolce Int'l/Hartford, Inc., 225 F.R.D. 73, 79 (D. Conn. 2004) (citing 29 U.S.C. § 2104(a)(1)).

### 2.   **Analysis of Plaintiffs' WARN Act Claim**

The parties do not dispute that no Plaintiff received 60 days notice that a lay-off would occur in late April/early May 2007.  (See Pl. SMF II, ¶ 6; Def. Resp. to Pl. SMF II, ¶ 6).  Nor do they dispute that Defendants laid off more than 50 employees within a 30 day period in late April/early May 2007.  (Pl. SMF II, ¶ 3). Instead, they dispute whether or not the notice was required under the WARN Act. Defendants argue that they are entitled to summary judgment on this claim because they were not required to give the 60 day notice as the layoffs at issue in this case did not result from a "plant closing."  (Doc. 244-1, Def. Br. at 14). Plaintiffs argue that they were entitled to the 60-day notice because the reduction in force resulted from a "plant closing," specifically, the shutdown and transfer of "the Casement 300, double hung 300, double hung glass, and Visions departments," and they seek summary judgment on this claim.  (Doc. 248-1, Pl. Br. at 2-3).  The dispute thus centers on whether the shutdown and transfer of the 300-series windows at the PDW facility in Gainesville constituted the shutdown of an "operating unit" for purposes of the WARN Act.

Both Plaintiffs and Defendants cite <u>Pavao v. Brown & Sharpe Manufacturing Co.</u>, 844 F. Supp. 890 (D. R.I. 1994) in support of their motions for summary judgment on Plaintiffs' WARN Act claim.  (<u>See</u> Doc. 244-1, Def. Br. at 15-16; Doc. 248-1, Pl. Br. at 3-4).  In <u>Pavao</u>, the court evaluated whether the shutdown of the defendant's Consolidated Parts Department ("CPD") constituted a "plant closing" within the meaning of WARN, thus triggering the 60-day notice requirement under the Act.  844 F. Supp. at 891-92.  The court found that the CPD was an "operating unit," and the shutdown of that unit was a "plant closing," and therefore granted summary judgment to the plaintiffs on their WARN Act claim because the defendant had failed to provide the 60-day notice.  <u>Id.</u> at 898.  The court noted,

> [The] plaintiffs offer[ed] the following evidence in support of the notion that the CPD is an "operating unit" for purposes of WARN:

>> The Brown & Sharpe manufacturing (*sic*) general managers created a new department, a WARN "operating unit," to save money by centralizing the manufacture of component parts: they moved machines, laid off redundant workers, created a new supervisory hierarchy, and established the new and highly touted "Consolidated Parts Department".  The cost accountants gave the Consolidated Parts Department its own "cost center" department number, MS Department No. 5375.

>> Upon its creation in mid-1989, the Consolidated Parts Department became responsible for manufacturing all parts for the Machine Tool (Grinding Machines) Division, the Precision Tool Division and the Measuring Systems Division.  For all purposes, Brown & Sharpe treated the Consolidated Parts Department like a separate operating unit, with its own separate managers, its own separate budget, and its own

> separate workforce of part-making specialists. . . .
> From mid-1989 to its permanent shutdown at the close
> of the first calendar quarter of 1991, the Consolidated
> Parts Department stood as the sole and exclusive
> "operating unit", the sole department, manufacturing
> parts for Brown & Sharpe's final products.

Id. at 895 (quoting the plaintiffs' briefs). The court found that "CPD [was] an 'operating unit' for purposes of WARN" and noted specifically that "the CPD had its own managers, its own separate budget (along with a separate 'cost center' accounting number), and its own separate workforce." Id. The court explained that the defendant, "in creating the CPD, created a separate organizational and operating structure," and "[a]s the DOL regulations make clear, such a separate organizational structure, imposed by the employer, is at the heart of the definition of an operating unit for purposes of WARN." Id.

In this case, Defendants argue that they did not shut down an "operating unit" when they moved production of the series-300 windows to Wisconsin. (Doc. 244-1, Def. Br. at 15-19). They point to evidence that some departments made component parts for different product lines; that the plant was managed at the plant level, not at the department level—the Gainesville plant had a budget for the whole plant, and there was a plant manager who oversaw the facility; that supervisors of each department had more limited responsibilities and could not purchase materials in their own departments, determine production levels or order overtime work; and that supervisors were assigned to oversee multiple departments, and employees frequently moved from department to department,

but "this frequent movement of labor costs was not consistently tracked by department for accounting purposes." (Id. at 16-19).

Plaintiffs, on the other hand, argue that Defendants did shutdown an "operating unit." They point to evidence that "distinct product lines were shut down"; the plant was organized into departments, and the departments had their own budget and separate payroll and overtime; employees were assigned to departments; and employees' time was tracked in a time-keeping system "to ensure that their labor was charged to the appropriate department." (Doc. 257, Pl. Resp. at 19-21, 23-25).

The undersigned finds that there are genuine issues of material fact on whether shutting down production of the 300 series in Gainesville constituted shutting down an "operating unit" as defined by the WARN Act, its implementing regulations and the Department of Labor's analysis. It is uncontroverted that Defendants shut down the entire production of the 300-series windows and moved that production to Wisconsin, with the result that the workforce at the Gainesville plant was reduced by 50 and the plant thereafter produced only doors. However, the evidence concerning whether the 300-series was an "an **organizationally or operationally distinct** product, operation, or specific work function," 20 C.F.R. § 639.3(j) (emphasis added), is in dispute. The parties have failed to demonstrate the absence of a genuine issue of material fact on whether the production of the 300-series windows was accomplished in "a separate organizational and operating

61

structure." <u>Pavao</u>, 844 F. Supp. at 895.

Accordingly, it is **RECOMMENDED** that Defendants' and Plaintiffs' motions for summary judgment [Docs. 244 & 248] be **DENIED** on Plaintiffs' WARN Act claim (Count III).

## D.   <u>Plaintiffs' Motion for Summary Judgment on Certain of Defendants' Affirmative Defenses</u>

Plaintiffs contend that Defendants have not made a "factual showing" in support of several of their affirmative defenses, and therefore, these defenses "[m]ust [b]e [s]tricken." (Doc. 248-1, Pl. Br. at 30).

### 1.   <u>"Same Decision" Defense</u>

Plaintiffs asserts that "Defendants have not actually pled a 'same decision' defense," but that "to the extent that Defendants might contend that their Sixth, Seventh, and Eighth Defenses could be interpreted to assert[] such a defense, summary judgment should be granted, as it is without support of any kind." (<u>Id.</u>).

Defendants assert in their Sixth Defense:

> Any action taken by any Defendant with regard to Plaintiffs or their employment for legitimate, non-discriminatory reasons, and, as such, did not violate any legal right possessed by the Plaintiffs.

(Doc. 16, Answer).  Defendants assert in their Seventh Defense:

> Defendants have at all times fulfilled all obligations imposed upon them by law and acted in accord with, in good faith, and with reasonable grounds to believe that they were in compliance with Title VII, Section 1981, WARN and/or other applicable federal and state

law.

(Id.).  Defendants assert in their Eighth Defense:

> Defendants have neither intentionally nor willfully violated Plaintiffs' rights in any manner nor acted maliciously or with reckless disregard to any Plaintiff or any aspect of the Plaintiffs' employment or separation from employment, and at not time has any Defendant acted with an intent to injure any of the Plaintiffs.

(Id.).

Plaintiffs contend that "[t]he 'same decision' defense is implicated where an employee proves that he or she was the victim of discrimination[ and a]t that point, the employer is, where appropriate, permitted to try to prove that it would have taken the same action irrespective of the discriminatory motive." (Doc. 248-1, Pl. Br. at 30).  Plaintiffs argue, "Defendants have offered no justification at all for determining that the Plaintiffs were less suited to be retained as compared to the Hispanic employees who were retained."  (Id. at 31).

Although it is not clear that Defendants assert a "same decision" defense in their Sixth, Seventh and Eighth defenses, the undersigned finds that, to the extent they have asserted such a defense, genuine issues of material fact remain to be tried on whether Defendants terminated Plaintiffs' employment because of their race or national origin, or whether they terminated Plaintiffs' employment for the reasons articulated by Defendants, as discussed *supra*.  Accordingly, it is **RECOMMENDED** that Plaintiffs' motion to strike and for summary judgment on

Defendants' Sixth, Seventh and Eighth Defenses be **DENIED**.

### 2.    "Failure to Mitigate" Defense

In their Twelfth Defense, Defendants assert that "Plaintiffs have failed to mitigate their alleged damages as required by law." (Doc. 16, Answer). Plaintiffs argue that "Defendants' Twelfth Affirmative Defense asserts that Plaintiffs failed to mitigate their damages," but that Defendants have not provided a factual basis for each element of that defense, including "lack of diligence" and "that there was substantially equivalent employment available, which the Plaintiff rejected or did not reasonably seek out." (Doc. 248-1, Pl. Br. at 31).    Plaintiffs assert that during discovery, they served an interrogatory upon Defendants asking the following:

> Do you contend that any Plaintiffs have failed to use reasonable efforts to find replacement employment or otherwise mitigate damages? If so, please describe each and every additional effort each Plaintiff was obligated to expend in order to use reasonable efforts to mitigate damages; describe in full detail the facts demonstrating that the position in question constitutes substantially equivalent employment; state the date upon which you believe each such Plaintiff would have mitigated damages had he/she used reasonable efforts to do so; state the additional amount by which such additional efforts by each such Plaintiff would further mitigate[d] his/her damages: and identify each and every document supporting or otherwise relating to your response.

(Id. at 32).  According to Plaintiffs, Defendants responded as follows:

> Defendants object to this Request as irrelevant in part to the Complaint filed by Plaintiff Bagwell on whose behalf these Requests for Admissions, First Interrogatories and First Requests for Production of Documents are propounded.  Subject to and without

waiving the above objection, and solely for the purpose of, and in good faith adhering to, the Standing Order of Magistrate Cole regarding discovery, and foregoing the service of a separate and identical Interrogatory on behalf of other Plaintiffs, Defendant will assume this Request is made on behalf of all Plaintiffs.

Defendants object to this Interrogatory as overly broad, unduly burdensome, and oppressive.  Defendant has a right to preserve objections which need to be developed further in discovery such as the defense of failure to mitigate.  Defendants intend to inquire as to facts related to [] this Interrogatory during the depositions of Plaintiffs and will supplement this response as appropriate.

(Id. at 32-33).  Plaintiffs contend that Defendants have not served a supplemental response to that interrogatory, and "[s]ince Defendants have not identified any factual basis for the defense, summary judgment must be granted."  (Id. at 33).

In response, Defendants do not rebut Plaintiffs' assertion that they have not supplemented their interrogatory response to provide the requested information about Plaintiffs' failure to mitigate their damages.  Instead, they assert that "facts supporting Plaintiffs' failure to reasonably seek out substantially equivalent employment were uncovered during Plaintiffs' depositions," and they provide examples from the depositions of Plaintiffs Joel Redd, James Slayton, Robert Finch, Larry Borders and Gwen Gee.  (Doc. 253, Def. Resp. at 28-29).  Defendants contend that they "had no duty to supplement [their interrogatory response] because the evidence of Plaintiffs' failure to mitigate had already 'been made known to the [Plaintiffs] during the discovery process.' Fed. R. Civ. P. 26(e). " (Id. at 29).  Defendants argue that "[a]s a factual basis for Defendants' affirmative

defense has certainly been established, Plaintiffs' motion for summary judgment/motion to strike should be denied." (Id.).

The undersigned cannot find, on the state of the record and based on the presentations by the parties, that Plaintiffs are entitled to summary judgment on Defendants' Twelfth Defense, i.e., Plaintiffs' alleged failure to mitigate their damages. Accordingly, it is **RECOMMENDED** that Plaintiffs' motion to strike and for summary judgment on Defendants' Twelfth Defense be **DENIED**.

The undersigned notes, however, that Defendants' response to Plaintiffs' interrogatory concerning Defendants' claim that Plaintiffs have failed to mitigate their damages is inadequate. Although Defendants now point to a few of the 32 Plaintiffs' depositions to show that, at least some of the plaintiffs may have failed to mitigate their damages, Defendants apparently have not provided an interrogatory response that addresses all Plaintiffs, or that sets forth the factual bases for Defendants' assertion of that defense. Accordingly, Defendants are **DIRECTED** to provide to Plaintiffs **no later than fourteen (14) days** from the date of entry of this Report and Recommendation, a supplemental response to the foregoing Plaintiffs' interrogatory in which Defendants provide the requested information for each Plaintiff. If Defendants do not possess information or documents showing that a particular plaintiff has failed to mitigate his or her damages, they should so indicate in their supplemental response.

### 3.  **"Good Faith Efforts to Prevent Discrimination" Defense**

Plaintiffs contend that "Defendants' Seventh Affirmative Defense [set forth *supra*] asserts that Defendants[] acted based on a good faith belief that they were complying with federal law," and that "[w]hile unclear, it may be that Defendant is attempting to assert the 'good faith' affirmative defense under *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 . . . (1999)." (Doc. 248-1, Pl. Br. at 33). Plaintiffs argue that Defendants have failed to provide factual support for that defense, which "provides a defense to punitive damages for certain discriminatory acts 'if the employer established that its managers' actions were contrary to its "good-faith efforts to comply with Title VII." *Kolstad*, 527 U.S. at 545-46 . . . .' *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261 (11th Cir. 2008)." (Id. at 33-34).

As discussed *supra*, the undersigned finds that there are triable issues of material fact on whether Defendants discriminated against Plaintiffs on the basis of their race and national origin.   Accordingly, it is **RECOMMENDED** that Plaintiffs' motion to strike and for summary judgment on Defendants' Seventh Defense be **DENIED**.

## VII.   Summary

It is **ORDERED** that Plaintiffs' Motion to Extend Time to File Exhibits by One (1) Day [Doc. 246] is **GRANTED**; Plaintiffs' Motion to Exceed Page Limitations of N.D.Ga. Local Rule 7.1(D) [Doc. 247] is **GRANTED**; Defendants' Motion for Leave to Exceed Page Limitation for Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment [Doc. 254] is **GRANTED**; Plaintiffs' Motion to

Exceed Page Limitations of N.D.Ga. Local Rule 7.1(D) [Doc. 273] is **GRANTED**; Plaintiffs' objection [Doc. 275] is **OVERRULED**, and Plaintiffs' motion to strike [Doc. 275] is **DENIED**; and Plaintiffs' Request for Oral Argument [Doc. 276] is **DENIED**.

It is further **ORDERED** that Defendants provide to Plaintiffs a supplemental response to Plaintiffs' interrogatory concerning mitigation of damages, as discussed in the body of this Report, **no later than fourteen (14) days** from the date of entry of this Report and Recommendation.

It is **RECOMMENDED** that Defendants' Motion for Summary Judgment [Doc. 244] and Plaintiffs' Motion for Summary Judgment [Doc. 248] be **DENIED**.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 8th day of February, 2011.

*Susan S. Cole*

SUSAN S. COLE
United States Magistrate Judge